**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-22066-CIV-ALTONAGA/Simonton**

**THOMAS APRIGLIANO**, *et al.*,

      Plaintiffs,

vs.

**AMERICAN HONDA MOTOR**
**CO., INC.,**

      Defendant.

_____/

**ORDER**

    **THIS CAUSE** came before the Court upon Defendant, American Honda Motor Co., Inc.'s ("Honda['s]") Motion to Dismiss . . . ("Motion") [ECF No. 30], filed August 30, 2013.  On September 16, 2013, Plaintiffs, Thomas Aprigliano ("Aprigliano") and Thomas Lucci ("Lucci") (collectively, "Plaintiffs"), filed a Response in Opposition . . . ("Response") [ECF No. 31].  Honda filed its Reply . . . ("Reply") [ECF No. 32] on September 26, 2013.  The Court has carefully reviewed the parties' written submissions, the record, and applicable law.

**I. BACKGROUND**[1]

    Honda manufactures motorcycles for sale to the public.  (*See* Am. Compl. ¶ 8).  One such motorcycle is the Honda Gold Wing, introduced to the market in 1974 and modified in 2001 when model GL 1800 was introduced.  (*See id.* ¶ 9).  The Gold Wing GL 1800 ("GL 1800") contains a five-speed manual transmission that uses a sequential gearbox.  (*See id.* ¶ 10).  The GL 1800 is marketed as a luxury touring motorcycle and is referred to as a "gentle giant" that offers an "unbelievably smooth, quiet[,] and vibration[-]free" ride.  (*Id.* ¶ 13).  Among other

---

[1]  The allegations in Plaintiffs' Amended Class Action Complaint . . . ("Amended Complaint") [ECF No. 27] are taken as true.

boasts, Honda states the GL 1800 sets "the touring motorcycle standard of the world," and is "in a class of its own." (*Id.*).

However, the GL 1800 suffers from defective design and machining, causing the transmission to suddenly drop gears on its own — a phenomenon known as "ghost shifting." (*Id.* ¶ 14). This defect in the GL 1800 makes it dangerous and unsuitable for the long-distance riding for which the motorcycle is advertised. (*See id.* ¶ 15).

Honda has been aware of the GL 1800's defective condition since the time of manufacture. (*See id.* ¶ 16). Additionally, numerous GL 1800 owners have filed complaints with the National Highway Traffic Safety Administration ("NHTSA") regarding the ghost shifting problem. (*See id.*). Rather than fix the problem, Honda concealed the defect by assigning the blame for the deficiency on "bent shift forks and other alleged causes which are either symptoms of or unrelated to the cause of the actual defect." (*Id.* ¶ 42). Even after contacting Honda and its authorized repair stores to complain about the issues with the GL 1800, Plaintiffs were told the motorcycles were not defective. (*See id.* ¶ 18). Honda failed to disclose and concealed the true nature of the defect — poor design and/or machining of the motorcycle's gears. (*See id.* ¶ 19).

Prior to making their decision to purchase GL 1800s, Plaintiffs believed the motorcycle was suitable for long-distance touring. (*See id.* ¶¶ 24, 34). In April 2008, Lucci purchased his pre-owned 2001 GL 1800 from J.R. Harris Trikes Sales of Inverness, an authorized Honda dealership. (*See id.* ¶ 34). Lucci's GL 1800 had approximately 39,000 miles on it at the time of purchase. (*See id.*). Similarly, Aprigliano purchased a pre-owned 2008 GL 1800 from Seminole PowerSports, an authorized Honda dealership, in April 2011. (*See id.* ¶ 24). Aprigliano had seen printed and internet advertising materials regarding the motorcycle's suitability for long

distance touring before he purchased his GL 1800.  (*See id.*).  Aprigliano's GL 1800 had approximately 3,000 miles on it at the time of purchase.  (*See id.*).

The factory warranty[2] included with both motorcycles states, "American Honda warrants to the first retail purchaser . . . and each subsequent owner that the motorcycle is free from defects in materials and workmanship for the period stated below," which in the case of any GL series motorcycle, is "three (3) years."  (Honda Motorcycle Warranties, 1991 and Subsequent Years ("1991 Honda Warranties") 6 [ECF No. 30-1]; Honda Motorcycle Warranties, 2008 and Previous ("2008 Honda Warranties") 6 [ECF No. 30-2]).  The 1991 and 2008 Warranties guarantee "Honda will repair or replace, at its option, any part that is found defective in material or workmanship under normal use."  (1991 Honda Warranties 6; 2008 Honda Warranties 6).  The factory warranties on Plaintiffs' motorcycles had already expired by the time Plaintiffs purchased their GL 1800s.  (*See* Am. Compl. ¶ 25; *see also* Resp. 3).

Shortly after Aprigliano purchased his GL 1800, he began experiencing "ghost shifting difficulties" routinely while using his motorcycle, especially while riding in fifth gear.  (Am. Compl. ¶ 29).  In December 2011, Aprigliano took his GL 1800 to Seminole PowerSports for repair and was advised by a mechanic that there are often GL 1800s in the repair shop with the same problem due to a known manufacturing and design defect in the GL 1800 transmission. (*See id.* ¶ 30).  "Honda informed Aprigliano that the factory warranty, even if in effect, would not have covered the repair."  (*Id.* ¶ 31).  After several months of repair to the GL 1800's transmission, Aprigliano received his motorcycle from the mechanic and paid him $3,361.53 for

---

[2]  On a motion to dismiss the Court is generally limited to the complaint and attached exhibits.  Plaintiffs have referenced the written Warranties in the Amended Complaint without attaching them as exhibits. Honda, however, attached the Warranties to its Motion, and therefore the Court may consider the Warranties because they are referenced in Plaintiffs' Amended Complaint, are central to the dispute, and their contents are not in dispute.  *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007).

the repairs.  (*See id.* ¶ 32).  Honda refused to reimburse Aprigliano for the repair costs.  (*See id.*).

Lucci also experienced "ghost shifting difficulties" with his GL 1800, most often while riding in fifth gear.  (*Id.* ¶ 38).  In January 2012, Lucci took his GL 1800 to Seminole PowerSports to have the transmission repaired.  (*See id.* ¶ 39).  A mechanic informed Lucci there were other GL 1800s experiencing the same problem.  (*See id.*).  Lucci paid $3,098.06 for repair costs related to the transmission.  (*See id.* ¶ 40).  To this day, Honda has not addressed the defect in the GL 1800 and has failed to warn its consumers about the existence of the defect or recall the vehicle.  (*See id.* ¶ 44).

Plaintiffs seek monetary compensation for themselves and a class of others similarly situated for the monies paid, the diminution in value, and the costs of repairing their GL 1800s.  (*See id.* 23).  Specifically excluded from this proposed class are individuals who suffered personal injury, death, or property damage from the alleged GL 1800 defect.  (*See id.* ¶ 45).  The Amended Complaint contains five separate grounds for relief: (Count I) strict liability; (Count II) negligent misrepresentation; (Count III) negligent failure to warn; (Count IV) breach of express warranty; and (Count V) fraudulent concealment.  (*See id.* ¶¶ 53–92).  Honda seeks dismissal of the Amended Complaint on all counts.  (*See generally* Mot.).

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

## III.  ANALYSIS

### A.  Counts I, II, & III

Honda argues Counts I, II, and III are barred by Florida's economic loss rule.  (*See* Mot. 8–9).  As to Count I, Plaintiffs respond that the economic loss rule does not apply to situations where the defect at issue poses a serious risk of physical injury or death.  (*See* Resp. 7). Regarding Counts II and III, Plaintiffs contend the economic loss rule does not apply to claims of negligent misrepresentation and negligent failure to warn because "these torts are independent of a claim for negligence in the design or manufacture [of] the Gold Wing."  (*Id.* 8).

#### 1.  The Economic Loss Rule

"[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses."  *Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.*, 110 So. 3d 399, 401 (Fla. 2013) (citation omitted).  The Florida Supreme Court has defined economic losses as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of

profits — without any claim of personal injury or damage to other property." *Id.* (citation and internal quotation marks omitted).  The result is that "'a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.'" *Id.* at 404–05 (quoting *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 901 (Fla. 1987)).

The United States Supreme Court, in adopting the economic loss rule, explained, "[e]ven when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain — traditionally the core concern of contract law." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986) (citation omitted).  The Court held that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* at 871.  This is due, at least in part, to the fact that "[d]amage to a product itself is most naturally understood as a warranty claim.  Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" *Id.* at 872 (quoting J. White & R. Summers, *Uniform Commercial Code* 406 (2d ed. 1980)).

Although the economic loss rule has been used in both the products liability context and in cases where the parties were in contractual privity, the Florida Supreme Court recently declared "the economic loss rule applies only in the products liability context." *Tiara*, 110 So. 3d at 407.  In *Tiara*, the Florida Supreme Court discussed the history of the economic loss rule, from its products liability roots in *Seely v. White Motor Co.*, 63 Cal. 2d 9 (Cal. 1965), and *East River*, 476 U.S. 858, to its later expansion to contractual privity cases.  *See Tiara*, 110 So. 3d at 403–07.  The Court noted,

the essence of the early holdings discussing the rule is to prohibit a party from suing in tort for purely economic losses to a product . . . , the rationale being that in those cases contract principles are more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage.

*Id.* at 405 (quoting *Moransais v. Heathman*, 744 So. 2d 973, 980 (Fla. 1999) (internal quotation marks and brackets omitted)).  Thus, the Court receded from its prior rulings "to the extent that they have applied the economic loss rule to cases other than products liability."  *Id.* at 407.

### 2.  Count I – Strict Liability

The Florida Supreme Court recognized strict products liability as a cause of action in *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80 (Fla. 1976).  To establish a claim for strict liability in the products liability context, the plaintiff is required to show an injury to someone or something other than the product itself.  *See Jacobs v. Osmose, Inc.*, No. 01-944-civ, 2002 WL 34241682, at *2 (S.D. Fla. Jan. 3, 2002).  Clearly, this case arises in the products liability context.  Plaintiffs' allegations all revolve around an alleged defect in the manufacture and design of motorcycles placed in the stream of commerce by Honda, a manufacturer and distributor of consumer goods.  (*See* Am. Compl. ¶ 2 ).

However, Plaintiffs do not allege they suffered a personal injury or an injury to property other than "injury" to their GL 1800s.  (*See generally id.*).  The only damages allegedly sustained by Plaintiffs are economic losses related to the loss of value to their motorcycles, the purchase price of their motorcycles, the loss of use of their motorcycles, and the costs associated with repairing the motorcycles.  (*See id.*  ¶¶ 32, 40, 71, 76, 84, 86, 92).  Plaintiffs may not recover these purely economic losses under a strict liability theory.  *See Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1230 (S.D. Fla. 2008) ("Florida law prohibits the recovery of purely economic losses in a tort action." (citation omitted)); *Cedars of Lebanon*

*Hosp. Corp. v. European X-Ray Distribs. of Am., Inc.*, 444 So. 2d 1068, 1071 (Fla. 3d DCA 1984) ("[S]trict liability should be reserved for those cases where there are personal injuries or damage to other property only."), *cited with approval in Fla. Power & Light Co.*, 510 So. 2d at 902 ("We hold contract principles more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage.").

Plaintiffs argue the economic loss rule does not require dismissal of their tort claims even though Plaintiffs' GL 1800s have not injured people or damaged other property.  (*See* Resp. 7).  Plaintiffs cite *Pulte Home Corp., Inc. v. Ply Gem Indus., Inc.*, 804 F. Supp. 1471 (M.D. Fla. 1992), for the contention that the economic loss rule does not apply to situations where the allegedly defective product is "substantially likely to result in personal injury or damage to other property."  (Resp. 7 (citing *Pulte Home*, 804 F. Supp. at 1482)).  Plaintiffs misconstrue the meaning of the court's holding.  In *Pulte Home*, the court specifically noted, "[t]he weight of authority states that . . . economic loss claims are founded in contract law and warranty law rather th[a]n in tort law."  *Pulte Home*, 804 F. Supp. at 1488 (citations omitted).  The court went on to say, "[i]n order for the [c]ourt to find damage beyond economic loss, Pulte will have to prove *other* damages or personal injury."  *Id.* at 1489 (emphasis added).  Although the court denied summary judgment on the issues relating to economic loss and strict liability, the court did so because it was unable to make a determination of damages based on the dearth of facts presented, not because of some substantial hazard inherent in the product.  *See id.*

Furthermore, in *Pulte Home*, the plaintiffs alleged the defendant's faulty product had caused multiple injuries to other people as a direct result of the alleged defect.  *See id.* at 1482.  In contrast, Plaintiffs' allegations contain no mention of any damages to people or property besides the GL 1800s themselves, further distinguishing this case from *Pulte Home*.  The weight

of authority requires the Court dismiss Count I as barred by the economic loss rule.  *See Jacobs*, 2002 WL 34241682, at *2 (finding the plaintiff failed to state a cause of action in strict liability where the plaintiff alleged the defendants' product contained chemicals that caused severe injuries, but failed to allege injury to himself or any other property).

### 3.  Counts II & III – Negligent Misrepresentation & Failure to Warn

Plaintiffs' claims for negligent misrepresentation fare no better.  The economic loss rule has been interpreted as "a broad bar to tort claims for damage solely to the product itself." *Turbomeca, S.A. v. Era Helicopters LLC*, 536 F.3d 351, 357 (5th Cir. 2008).  Recently, negligent misrepresentation claims were barred by the economic loss rule in the products liability context. *See Burns v. Winnebago Indus., Inc.*, No. 8:13-cv-1427-T-24 MAP, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013) (dismissing claims of negligent misrepresentation and fraudulent inducement against defendants, a manufacturer of recreational vehicles and the manufacturer of the vehicle's chassis, where it was alleged the defendants sold the plaintiff a product they knew was defective).  Usually claims for negligent misrepresentation are barred by the economic loss rule where, as here, there are claims for breach of warranty alongside tort claims and the allegations contained in both are similar.  *See Premix-Marbletite Mfg. Corp. v. SKW Chems., Inc.*, 145 F. Supp. 2d 1348, 1359 (S.D. Fla. 2001) (granting summary judgment against plaintiff where only economic losses were pleaded and "the allegations contained in [the plaintiff's] tort claims [were] essentially the same as those in its breach of warranty claims"); *Pavletic v. Bertram Yacht, Inc.*, No. 11-60484-civ, 2011 WL 3475394, at *6 (S.D. Fla. Aug. 9, 2011) ("Given the similarities between the alleged obligations under the warranty and the acts that [p]laintiff identifies as constituting negligent misrepresentation and fraud in the inducement, these claims, as pled, are barred under Florida law.") (footnote call number omitted).

Here, Plaintiffs' cause of action for negligent misrepresentation is dependent on the same fundamental allegations contained in the breach of warranty claim — specifically, that Honda breached the terms of its Warranties by providing Plaintiffs with defective motorcycles and failing to repair or replace those motorcycles.  As a result, Plaintiffs' claim in Count II is also barred by the economic loss rule.  *See, e.g., HTC Leleu Family Trust v. Piper Aircraft, Inc.*, No. 1:12-cv-21118-KMM, 2012 WL 4982633, at *4 (S.D. Fla. Oct. 17, 2012) (finding plaintiff's claims for fraud in the inducement, fraudulent concealment, and negligent misrepresentation were barred by the economic loss rule where the only damages alleged were purely economic losses and the allegations in the complaint in support of those claims all related to the question of "whether [d]efendant breached the agreement by providing a defective [product].").

Plaintiffs argue the Florida Supreme Court's decision in *Tiara* left undisturbed the exception to the products liability economic loss rule for "independent torts such as negligent misrepresentation."  (Resp. 9).  The negligent misrepresentation exception to the economic loss rule has its origins in *PK Ventures, Inc. v. Raymond James & Assocs., Inc.*, 690 So. 2d 1296 (1997), wherein the Florida Supreme Court held that such an exception to the economic loss rule existed for the buyer of residential property against the seller's real estate agent.  *See id.* 1296– 97.  Thus, it appears the exception itself developed against the backdrop of the contractual privity economic loss rule — a fact that may explain the reason Plaintiffs do not cite a single case applying the negligent misrepresentation exception to the economic loss rule in the products liability context.

The Court finds the logic of *Burns* sounder.  After holding the exceptions to the economic loss rule for fraudulent inducement and negligent misrepresentation did not apply in the products liability context post-*Tiara*, the court stated:

> [t]o hold otherwise would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, such a purchaser could assert claims for negligent and fraudulent concealment regarding the defect to avoid the economic loss rule.

*Burns*, 2013 WL 4437246, at *4.  Given the *Tiara* court's resounding approval of the economic loss rule in the products liability context, the Court likewise concludes the economic loss rule bars Plaintiffs' claim for negligent misrepresentation under the facts alleged.

The claim for negligent failure to warn is similarly barred by the economic loss rule.  *See Barnext Offshore, Ltd. v. Ferretti Group USA, Inc.*, No. 10-23869-civ, 2012 WL 1570057, at *4 (S.D. Fla. May 2, 2012) (finding post-sale failure to warn claims are limited by the economic loss rule); *accord Turbomeca, S.A.*, 536 F.3d at 357.  Extending the logic of *East River* to the instant case, if a manufacturer has no duty to prevent a product from injuring itself, it likewise can have no duty to warn a purchaser that the product may injure itself.  *See, e.g.*, *Sea-Land Serv., Inc. v. Gen. Elec. Co.*, 134 F.3d 149, 155–56 (3d Cir. 1998) ("Where, however, damage from a defect is only to the product itself and is only economic, there is no tort recovery.  The policy of economic loss is better adjusted by contract rules than by tort principles.  This conclusion is as true for strict liability and negligence cases as it is for failure to warn cases.  Thus, a manufacturer may be culpable of a failure to warn, but if the damage is solely to the product itself and is solely economic, there is no tort recovery.").

In support of the viability of Counts II and III, Plaintiffs cite to *Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F.2d 501 (5th Cir. 1989), and *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813 (11th Cir. 1984).   Neither of these cases supports Plaintiffs' claims.  Without opining as to the viability of a negligent failure to warn claim for a defect discovered by the manufacturer some time after the manufacture of a defective product,

the court in *Nicor Supply Ships* affirmed the district court's dismissal of the plaintiff's claim for negligent failure to warn.  *See Nicor Supply Ships*, 876 F.2d at 505.  The Fifth Circuit went on to say:

> [w]ere we to allow [the plaintiff] to succeed on its [negligent failure to warn] claim, we would invite all purchasers of self-damaging products that were negligently manufactured but beyond the coverage of the warranty to style their complaints in terms of the manufacturer's negligent failure to warn of a known defect.  Permitting recovery on such grounds would frustrate the Supreme Court's plain intention that a manufacturer be liable for the damage a product causes to itself as a result of negligent manufacturer only to the extent that the parties have contractually agreed to apportion such liability.

*Id.*, 876 F.2d at 504.  *Miller Industries* is even less helpful to Plaintiffs, as that case was decided before the Supreme Court's decision in *East River*, and relied heavily on a Fifth Circuit case, *Jig Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), which was overruled by *East River*.  *See Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 927 (5th Cir. 1987) ("The [Supreme] Court . . . effectively overruled our own law on the subject articulated in [*Jig Third Corp.*] . . . .").  For these reasons, the Court is not persuaded by Plaintiffs' arguments.

### B.  Count IV – Breach of Warranty

Honda maintains Count IV should be dismissed because Plaintiffs have not alleged the manifestation of a defect during the warranty period, Honda did not make any express warranties beyond the factory warranty, and Plaintiffs do not allege they provided Honda with notice of the alleged defect.  (*See* Mot. 5–7).  Additionally, Honda contends Lucci's claim in Count IV is barred by the statute of limitations.  (*See id.* 5–6).  According to Plaintiffs, their claims for breach of an express warranty are within the five-year statute of limitations provided by Florida law.  (*See* Resp. 3).  Plaintiffs also argue the advertising materials disseminated by Honda regarding the GL 1800 create express warranties by affirmation that Honda breached.  (*See id.* 4–

5).

### 1. Breach of Factory Warranty

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 525 (1992).  Under Florida law, a written warranty is treated like a contract between the seller and the buyer. *See David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1318 (S.D. Fla. 2009) (citation omitted).  As such, the terms of an express warranty may limit or foreclose the remedies available to the buyer. *See id.* at 1318–19 (citation omitted).  A claim for breach of an express warranty generally requires the parties to have contractual privity. *See Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.*, No. 8:09-cv-607-T-27MAP, 2010 WL 1223126, at *6 (M.D. Fla. Mar. 25, 2010).  However, Florida courts have relaxed the contractual privity requirement where the express warranty was intended to benefit subsequent owners. *See Mesa v. BMW of N. Am., LLC*, 904 So. 2d 450, 457–58 (Fla. 3d DCA 2005) (holding the plaintiff — a subsequent purchaser who was not in privity of contract with the manufacturer — was entitled to enforce the terms of the manufacturer's warranty because the warranty extended to subsequent purchasers); *Fischetti v. Am. Isuzu Motors, Inc.*, 918 So. 2d 974, 976 (Fla. 4th DCA 2005) ("The manufacturer can hardly be heard to resurrect a common law requirement of privity when it has itself voluntarily provided a warranty that runs in favor of remote purchasers of its product.").  Furthermore, Florida law provides a five-year statute of limitations on claims arising under "[a] legal or equitable action on a contract, obligation, or liability founded on a written instrument . . . ." FLA. STAT. § 95.11(2)(b).

Here, the express limited warranties were intended to benefit subsequent GL 1800 owners.  However, the terms of the 1991 Honda Warranties and 2008 Honda Warranties limit the

Case 1:13-cv-22066-CMA   Document 35   Entered on FLSD Docket 10/28/2013   Page 14 of 19

CASE NO.  13-22066-CIV-ALTONAGA

remedies available to GL 1800 owners to the reparation or replacement of defective parts for a three-year period.  Plaintiffs have asserted they purchased their GL 1800s after the factory warranties issued by Honda had expired.  Plaintiffs cannot plead they experienced any defect during the express warranty periods, much less that they presented their motorcycles to Honda for repair during the warranty periods, as they clearly lacked ownership interests in the motorcycles during the warranty periods.[3]  Consequently, Plaintiffs' claims for breach of express warranty based on their GL 1800s' factory warranties are not viable.[4]

## 2.  Breach of Warranty by Affirmation

With regard to the creation of express warranties, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." FLA. STAT. § 672.313(1)(a).  Statements made in promotional materials, advertisements, and brochures may be sufficient to create an express warranty if the buyer relies on those statements

---

[3]  Lucci not only purchased his GL 1800 after the warranty expired sometime in 2004, but his claim for breach of warranty is brought well after five years from the expiration of the factory warranty.  (*See* Resp. 3).  Consequently, Lucci's breach of warranty claim predicated on the factory warranty is barred by the statute of limitations.  *See McKissic v. Country Coach, Inc.*, No. 8:07-cv-1488-T-17EAJ, 2009 WL 500502, at *12 (M.D. Fla. Feb. 27, 2009) ("This Court holds that the five-year statute of limitations set forth in Florida Statute[s] [section] 95.11(2)(b) begins to run for a claim of breach of express warranty when the breach giving rise to the cause of action is discovered or should have been discovered, *or* when such warranty expires, whichever occurs first." (emphasis in original)).

[4]  In response to Plaintiffs' brief equitable estoppel argument, the Court is not persuaded principles of equity and fair play are served by making a manufacturer of a product liable to a subsequent purchaser outside the warranty period for an alleged defect the manufacturer never had the opportunity to repair or replace, as provided in the terms of the written warranty.  *Cf. Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 830 (Cal. Ct. App. 2006) (citations omitted) ("Several courts have expressly rejected the proposition that a latent defect, discovered outside the limits of a written warranty, may form the basis for a valid express warranty claim if the warrantor knew of the defect at the time of sale."); *McCabe v. Daimler AG*, No. 1:12-cv-2494-TCB, 2013 WL 2452180, at *6 (N.D. Ga. June 7, 2013) (dismissing the plaintiffs' breach of warranty claims where the plaintiffs alleged the manufacturer knew of the defect at the time of sale, but failed to allege they presented their vehicles for repair within the factory warranty period).

in making his purchase.  *See State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami, Inc.*, 557 So. 2d 107, 108 (Fla. 3d DCA 1990) ("A seller's representations in newspaper advertisements, catalogues, circulars, etc., may become a part of the contract of sale and constitute an express warranty for breach of which the seller will be liable for damages to one who, in making the purchase, relies thereon to his injury." (citation omitted)).  Yet, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  FLA. STAT. § 672.313(2).  Indeed, mere puffery or sales talk is not sufficient to create an express warranty.  *See Carter Hawley Hale Stores, Inc. v. Conley*, 372 So. 2d 965, 969 (Fla. 3d DCA 1979) ("[C]ertain affirmations of the seller amount only to 'puffing' and do not give rise to warranties, e.g., the 'nicest car in town.'"); *see also Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. 3d DCA 1995) (finding a seller's representations that a building was "a very good building" and "an excellent deal" were "clearly statements of opinion" and not actionable).

The statements and representations allegedly made by Honda regarding the GL 1800s are textbook puffery and mere opinion.  The majority of the representations alleged by Plaintiffs — such as the GL 1800 is "in a class of its own" and "the world's ultimate touring motorcycle" (Am. Compl. ¶ 13) — equate to boastful statements of opinion and sales talk.  Honda's representations related to its "Performance First" campaign (*id.*) are merely aspirational goals and not statements of fact.  The only arguably close statement presented by Plaintiffs is that "Honda refers to the GL 1800 as a 'gentle giant' that is 'unbelievably smooth, quiet[,] and vibration[-]free.'"  (*Id.*).  It appears obvious that no motorcycle can be completely free of vibration while in motion on a roadway, and thus it seems incredulous that any buyer would rely on the veracity of that statement in making a purchase.  Even more fatal to the claim, the adverb

"unbelievably" qualifies the descriptive adjectives "smooth," "quiet," and "vibration-free," placing the statement squarely in the realm of opinion.  How "unbelievably vibration-free" a motorcycle is or is not cannot be quantified, as it is completely subjective to each individual rider.  Consequently, these representations cannot form the basis of an express warranty between Honda and Plaintiffs.

## C.  Count V – Fraudulent Concealment

Honda contends Count V should be dismissed because Plaintiffs have not pleaded the elements of fraudulent concealment with the specificity required by Federal Rule of Civil Procedure 9(b).  (*See* Mot. 10).  Plaintiffs state they have adequately pleaded a cause of action of fraudulent concealment because the Amended Complaint sufficiently details the common schemes and practices of Honda over the past decade, and because Honda's representations regarding the quality of the GL 1800s give rise to a claim of fraud.[5]  (*See* Resp. 9–10).

A complaint alleging fraud "must state with particularity the circumstances constituting fraud."  FED R. CIV. P. 9(b).  To satisfy the requirements of Rule 9(b), the complaint must allege:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants "obtained as a consequence of the fraud."

*Brooks*, 116 F.3d at 1371.  This requires the plaintiff to "plead the who, what, when, where, and how" of the allegedly fraudulent statements or omissions, though the "specific facts related to the

---

[5]  Because the Court has already determined the representations at issue are statements of opinion and sales talk, and not representations of material fact, Plaintiffs cannot state a claim for fraudulent concealment on the basis of these alleged representations.  *See Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001) ("An action for fraud generally may not be predicated on statements of opinion or promises of future action, but rather must be based on a statement concerning a past or existing fact." (citations omitted)).  Therefore, the Court addresses only Plaintiffs' claims of fraudulent concealment related to Honda's alleged omissions of material fact regarding the defective gear-shifting system.

defendant's specific state of mind when the allegedly fraudulent statements were made" need only be alleged generally.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). To prevail on a claim for fraudulent concealment under Florida law:

> [p]laintiffs ha[ve] to prove [1] the [defendant] concealed or failed to disclose a material fact; [2] the [defendant] knew or should have known the material fact should be disclosed; [3] the [defendant] knew [its] concealment of or failure to disclose the material fact would induce the plaintiffs to act; [4] the [defendants] had a duty to disclose the material fact; and [5] the plaintiffs detrimentally relied on the misinformation.

*Philip Morris USA, Inc. v. Hess*, 95 So. 3d 254, 259 (Fla. 4th DCA 2012) (quoting *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060 (Fla. 1st DCA 2010) (some alterations added)).

Plaintiffs rely on *United States v. Prewett*, No. 8:07-cv-1575-T-27MAP, 2008 WL 840540 (M.D. Fla. Mar. 28, 2008), for the contention that allegations related to a scheme of fraud spanning several years need not be pleaded with the same level of specificity as in other fraud cases, but may satisfy the requirements of Rule 9(b) where the complaint pleads "allegations containing descriptions of the scheme, common practices of the defendant, the nature and subject of misrepresentations, and examples of misrepresentations . . . ." (Resp. 10 (citing *Prewett*, 2008 WL 840540 at *1)).  *Prewett* is distinguishable.

*Prewett* involved defendants whose business prepared fraudulent tax returns for various individuals, partnerships, and corporations.  *See Prewett*, 2008 WL 840540, at *1.  In *Prewett*, the facts alleged by the plaintiff comprehensively detailed the defendants' tax return scheme.  In particular, plaintiff alleged the place where the fraud occurred, that the defendants prepared false or fictitious tax returns to reduce their customers' wages for a specified period of time, that they did so to reduce the reported tax liability of their clients, and that they then claimed the omitted income on their clients' individual tax returns.  *See id.* at *2.  Additionally, the complaint contained "over a dozen specific examples" of allegedly fraudulent tax returns.  *Id.*  The

complaint also contained a chart illustrating nine examples for one tax year showing income omitted from the defendants' customer's tax return.  *See id.*  In addition to the allegations raised against the defendants generally, the complaint also contained specific allegations against the defendants individually for the fraudulent actions they committed in furtherance of the scheme. *See id.*

Here, Plaintiffs have not pleaded facts with the required level of specificity.  Plaintiffs plead facts regarding the existence of a defect in the GL 1800's transmission, but fail to plead facts sufficient to establish Honda's knowledge and concealment of the defect, much less that Honda's actions amount to a scheme to defraud its customers.  Although Plaintiffs assert "Honda failed to disclose and concealed the true nature of the defect" (Am. Compl. ¶ 19), Plaintiffs do not allege the specifics of Honda's purported scheme, the means Honda used to perpetrate the scheme, or specific facts indicating the existence of the alleged scheme.  Regarding the complaints to the NHTSA and those posted on internet forums related to the ghost-shifting problem, which allegedly put Honda on notice of the defective condition of the GL 1800, Plaintiffs do not include a single date for any of these seemingly anonymous complaints. Without these dates, it is impossible for the Court to know whether these complaints put Honda on notice before or after Plaintiffs purchased their GL 1800s.  This is particularly troubling considering Plaintiffs otherwise plead Honda's knowledge and concealment of the defect "upon information and belief."  (*Id.* ¶¶ 16, 42).  The specificity of the allegations regarding Plaintiffs' pleading of Honda's scheme of fraud pales in comparison to the detail exhibited by the plaintiff's pleading in *Prewett*.  Thus, Plaintiffs have failed to adequately plead a claim for fraudulent concealment with the requisite level of specificity required by the Federal Rules of Civil Procedure.

CASE NO.  13-22066-CIV-ALTONAGA

## IV.  CONCLUSION

Accordingly, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 30]** is **GRANTED**. Plaintiffs' Amended Complaint is **DISMISSED without prejudice**.  Plaintiffs have until **November 15, 2013** to file a second amended complaint, failing which, the Court will dismiss the case.

**DONE AND ORDERED** in Miami, Florida, this 28th day of October, 2013.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record